UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :     Crim. No.  3:03CR33(EBB)
                                :
     v.                         :
                                :     July 12, 2005
RENALDO M. ROSE                 :

            **GOVERNMENT'S MEMORANDUM CONCERNING**
           **WHETHER THE DISTRICT COURT SHOULD**
                **RESENTENCE RENALDO ROSE**

     Beginning in approximately September 2003, Renaldo Rose (the "defendant") developed, organized, and implemented a plan to kidnap and extort money from a wealthy Connecticut resident as a means to solve the defendant's desperate financial situation.  To that end, the defendant used the Internet to identify suitable individuals and, after identifying Edward Lampert ("Lampert") as a potential target, to research Lampert's background, business interests, personal history, and associates.  The defendant purchased a shotgun and other equipment, such as masks, plastic flexible restraints, tape recorders, voice-distortion equipment, and bullet proof vests, to facilitate the kidnapping.  The defendant also recruited others to help him, staging an armed robbery of a UPS truck approximately two weeks before the kidnapping as a means to test two recruits and training one of the new recruits, a seventeen year old, to use a shotgun. Finally, the defendant and three others kidnapped Lampert and held him bound and blindfolded in a motel bathroom for three days before releasing him unharmed in exchange for Lampert's agreement

to pay $40,000 five days after his release.

On May 17, 2004, the defendant was sentenced. The district court imposed concurrent sentences of 121 months on Counts One, Two, Four, and Five of the Superseding Indictment and a sentence of 60 months on Count Three, to run consecutively to the other sentences imposed, resulting in a total effective sentence of 181 months. The district court also imposed a term of supervised release of two years and a total special assessment of $500.

On May 25, 2004, Rose filed a timely notice of appeal.[1] On May 18, 2005, the United States Court of Appeals for the Second Circuit remanded the defendant's appeal in light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005) and <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005).

The Government respectfully submits this memorandum to assist the District Court in determining whether it should resentence the defendant. In sum, given the information before the court at sentencing concerning the defendant's criminal conduct, the Court should not impose a non-trivially different sentence on remand.

---

[1] On appeal, the defendant argued, among other things, that the district court's decision to do apply a role enhancement for his use of a minor during the crimes and his leadership role during the armed robbery was error.

I.  **PROCEDURAL HISTORY**

On January 13, 2003, United States Magistrate Judge Holly B. Fitzsimmons issued an arrest warrant based on a complaint against the defendant.  On January 18, 2004, the defendant was arrested in Toronto, Canada for violating Canadian immigration laws and subsequently was returned to the United States, where he was presented in United States District Court for the Western District of New York on the federal arrest warrant.

On February 7, 2003,  the defendant was presented in United States District Court for the District of Connecticut and was detained pending trial.  On February 18, 2003,  a federal grand jury returned a two-count indictment against the defendant.

On April 8, 2003, the grand jury returned a five-count Superseding Indictment against the defendant.  It alleged multiple violations of the Hobbs Act, 18 U.S.C. § 1951(a) (Counts One, Two, Four, and Five; conspiring to interfere with interstate commerce and interfering with interstate commerce by extortion), and a violation of 18 U.S.C. § 924(c)(Count Three; use and carrying of a firearm during and in relation to a crime of violence) stemming from the defendant's participation on December 24, 2002 in an armed robbery of a United Parcel Service truck in New Haven, Connecticut and his participation in the scheme to extort Edward Lampert, a Greenwich, Connecticut financier.

On June 30, 2003, the defendant moved to suppress evidence

seized from his residence and to sever the trial of certain counts. On January 9, 2004, the Court denied the motions.

On January 27, 2004, the defendant pleaded guilty to each count of the Superseding Indictment.

On May 17, 2004, the defendant was sentenced.

II. LAW

In Crosby, the Second Circuit determined that it would remand most pending appeals involving challenges to sentences imposed prior to Booker "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence." Crosby, 397 F.2d at 117. In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, under the circumstances existing at the time of the original sentence, if the judge had discharged his or her obligations under the post-*Booker/Fanfan* regime and counsel had availed themselves of their new opportunities to present relevant considerations." Id. "In making that threshold determination, the District Court should obtain the views of counsel, at least in writing, but 'need not' require the presence of the Defendant . . . ." Id. at 120. The defendant should, however, have an "opportunity . . . to avoid resentencing by promptly notifying

the district judge that resentencing will not be sought." Id. at 118. "Upon reaching its decision (with or without a hearing) whether to resentence, the District Court should either place on the record a decision not to resentence, with an appropriate explanation, or vacate the sentence and, with the Defendant present, resentence in conformity with the [Sentencing Reform Act], Booker/Fanfan, and this opinion, including an appropriate explanation, *see* § 3553(c)." Id. at 120.

## II. **FACTS OF THE OFFENSE**

The facts outlined below are recounted in the Offense Conduct section of the Presentence Report ("PSR"), to which the defendant did not object at his original sentencing. (See PSR ¶¶ 6-34; see Sent. Tr. dated 5/17/04, at 3.)[2] These facts well-

---

[2] The defendant did not object to the factual statements contained in the Offense Conduct section of the PSR and the district court thus was entitled to rely upon those facts in determining whether the enhancement applied. See Fed. R. Crim P. 52(b); United States v. Helmsley, 941 F.2d 71, 98 (2d Cir.1991) ("[I]f a defendant fails to object to certain information in the presentence report, she is barred from contesting the sentencing

supported the Court's sentence and strongly suggest that the Court should not consider imposing a non-trivially different sentence on remand.

During the summer of 2002, the defendant discharged from the United States Marine Corps and returned to Hamden, Connecticut. See PSR ¶ 8. While there, he renewed a friendship with Shemone Gordon ("Gordon"). Id. After returning to Connecticut, the defendant experienced serious financial problems and appears to have become interested in kidnapping for ransom a prominent individual as a means to solve his financial problems. Id. A forensic review of computer records seized from the defendant's Hamden residence reflected that in late September 2002 the computer was used to search for information about the kidnapping and ransom of two prominent Mexican citizens. Id.[3]

In approximately October 2002, the defendant approached

---

court's reliance on that information, unless such reliance was plain error.").

[3] On January 15, 2004, federal and local law enforcement officers executed a search warrant at the defendant's residence. While there, the officers seized a computer, which a subsequent forensic analysis determined contained information concerning Lampert and ESL Investments, among other things, and other materials, including: (1) scraps of paper bearing the names and addresses of other individuals, some of whom were prominent residents of Connecticut; (2) a notebook outlining a series of steps consistent with a plan to abduct a person; (3) a rental agreement for a van rented by the defendant; (4) a map of Greenwich; and (5) a document containing the name of another corporate officer of ESL Investments.

Gordon about whether he was interested in kidnapping someone for money. Id. ¶ 9. After doing so, the defendant began searching for information on the Internet about wealthy residents of Connecticut and Massachusetts. Id. While doing so, he compiled a list of individuals as potential targets for abduction and identified Lampert as a target to abduct. Id. He learned that Lampert resided in Greenwich, was in his 40s (and thus likely to have children) and had an estimated worth of $800 million. Id. The defendant also learned that Lampert operated ESL Investments, a Greenwich-based closed investment fund. Id. The defendant subsequently focused his search on Lampert, using the Internet to obtain information about him, ESL Investments, his business dealings, and his colleagues. Id. Initially, the defendant wanted to identify and kidnap a child, believing that Lampert would be more likely to pay a ransom quickly and without involving the police. Id. This initial plan, however, gave way to kidnapping Lampert himself. Id.

To facilitate the kidnapping, the defendant purchased from a Connecticut gun store an air pistol and, later, on December 2, a Mossberg shotgun. Id. ¶ 10. The defendant and Gordon also approached one of Gordon's former girlfriends, who worked as a desk clerk at a Holiday Inn Express in East Haven, Connecticut, to obtain credit card account numbers. Id. ¶ 11. The two explained to her that they were planning on kidnapping a

7

millionaire from Greenwich and needed credit card numbers to help purchase items necessary for the kidnapping. Id. They eventually obtained the credit card account numbers and registration information of hotel guests and used the credit card account numbers to purchase via the Internet bullet proof vests, flexible plastic handcuffs, masks, and services from fee-based computer search companies. Id. This activity occurred in early December 2002. Id.

Additionally, in mid-December 2002, Gordon and the defendant approached another individual to determine his interest in participating in the kidnapping. Id. ¶ 12. According to that individual, he knew Gordon from jail and Gordon telephoned him and asked to meet. Id. When he met with Gordon, the defendant was present. Id. Both the defendant and Gordon described a plan to kidnap a millionaire from Greenwich for ransom. Id. While in the defendant's car, the individual opened a folder lying on the back seat and observed hotel documents bearing credit card account information. Id. Recognizing the foolhardiness of the scheme, he declined to participate in it. Id.

Sometime in December 2002, Gordon met Devon Harris ("Harris") and Lorenzo Jones ("Jones") as a result of their mutual involvement in drug trafficking. Id. ¶ 13. The three became friends.

On December 24, 2002, the defendant, Gordon, Harris, and

Jones, who at the time was seventeen years old, drove together around the area of New Haven, Connecticut, in the defendant's Chrysler 300M.  Id. ¶ 14.  While doing so, they scouted the area to find a United Parcel Service delivery truck to rob.  Id. Harris carried a .22 caliber revolver in the Chrysler M300 while searching for the UPS truck to rob and intended to use it to help in robbing the truck. Id.  Eventually, the group located a United Parcel Service truck which they believed was a suitable target to rob. Id.  Before leaving the car, Harris gave the firearm to Jones so that he could use it during the robbery.  Id.  Gordon, Harris, and Jones then left the Chrysler M300 and entered the United Parcel Service truck with the intent to hijack the truck, drive it away, and then steal its cargo.   Id.

     While in the truck, Jones pointed the revolver at the UPS employee driving the truck and demanded the keys to the truck. Id. ¶ 15.  Further, they bound the UPS employee using a flexible plastic restraint and placed a hood over his head to block his sight.  Id.  They also forced the UPS employee onto his stomach in the cargo area of the truck.  Id.

     Because the truck's keys could not be located, the truck was not stolen as originally planned.  Id. ¶ 17.  Instead, the three stole money from the driver and four packages from the cargo area and returned to the Chrysler, where the defendant was waiting for them.  Id.  The defendant then drove Gordon, Harris, and Jones

9

from the scene of the robbery to Gordon's residence.  <u>Id.</u>  There, the four opened the packages and discovered that they had stolen a bag of peanuts, a telephone, a T-shirt and baseball hat bearing the Corona beer label, and an Alpine compact-disc changer.  <u>Id.</u>

In part, the robbery was designed to test Harris and Jones and their suitability for participating in the Lampert's kidnapping.  <u>Id.</u> ¶ 17.  Shortly after the armed robbery, the defendant and Gordon asked Harris whether he wanted to get $90,000 by helping them kidnap a person.  <u>Id.</u>  The defendant also asked Jones whether he was interested in participating in the kidnapping scheme, telling him that he liked how Jones handled himself with the gun during the robbery.  <u>Id.</u>

The defendant and Gordon twice practiced firing the shotgun in East Rock Park in New Haven.  Jones joined them on one of those occasions.  <u>Id.</u> ¶ 10.

On December 27 and December 30, the defendant rented minivans from a New Haven-area rental company to facilitate Lampert's kidnapping.  <u>Id.</u> ¶ 19.  The defendant traveled to Greenwich, Connecticut on several occasions, including December 27 and December 30, to surveil the offices of ESL Investments and to locate Lampert's residence and to obtain information about it. <u>Id.</u> ¶ 18.  Gordon, Jones, and Harris accompanied Rose on these trips at various times.  <u>Id.</u> On at least one occasion before January 10, the defendant, Gordon, and Jones traveled to

10

Greenwich intending to abduct Lampert, but the plan was aborted when Lampert left the office accompanied by another individual. Id.  In preparation for kidnapping Lampert on that occasion, the defendant rented a minivan and tinted its windows.  Id.

On January 10, 2003, the defendant, Gordon, Harris, and Jones drove to a car rental agency and the defendant rented a Ford Expedition.  Id. ¶ 20.  Later that day, they drove to Greenwich, Connecticut in the Ford Expedition intending to abduct Lampert.  Id.  The car contained flexible plastic restraints, masks, a shotgun, two-way radios, and an air-pistol, among other items.  Id.  The defendant was driving the Expedition.  Id.

After arriving in Greenwich, the defendant parked the Ford Expedition in the parking lot of the office building in which ESL was located.  Id. ¶ 21.  Gordon and Jones left the Expedition and hid in a small room in the parking lot to wait for Lampert to walk to his car, which was parked nearby.  Id.  They were carrying the shotgun and the air-pistol.  Id.  Harris remained in the Expedition with the defendant, who gave Harris a photograph of Lampert and told him to look for Lampert among the individuals walking into the parking lot.  Id.

After waiting for several hours, the defendant saw Lampert walking to his car and told Gordon and Jones via two-way radio to get him.  Id. ¶ 22.  Gordon and Jones, whose faces were concealed by masks, left the spot where they were hiding, walked up to

11

Lampert, pointed the shotgun and air-pistol at him, and forced him into the rear of the Ford Expedition. Id. Lampert was then handcuffed with the plastic restraints and had his face covered to block his sight. Id.

The group left the parking lot to return to the New Haven area. Id. ¶ 23. While driving, the defendant told the others to remove personal items from Lampert and to throw them away. Id. They did so. Id. During the drive, Gordon told Lampert that they were hired to kill him for $1 million as a result of Lampert's business dealings and then demanded $5 million from him to let him go unharmed. Id. Lampert told his kidnappers that his money was tied up in his business and that he could not pay them $5 million without drawing attention. Id. In response, Lampert was told that he would have to be killed him. Id.

The defendant, Gordon, Harris, and Jones returned to the New Haven area and eventually obtained a motel room in Hamden, Connecticut. Id. ¶ 24. They rented the room in order to hold Lampert in it. Gordon paid for the motel room using money taken from Lampert. Id. Once the room was rented, the defendant backed the Expedition to the motel room door and Lampert was pushed from the Expedition into the motel room. Id. Once inside, Lampert was taken to the bathroom, where he was held handcuffed and blindfolded. Id.

Harris left the motel room shortly after Lampert was put in

12

the bathroom.  Id. ¶ 25.  Before leaving, he took one of Lampert's credit cards.  Id.  He did not return to the motel room until after Lampert's release on January 12, 2003.  Id.

While Lampert was held in the motel room, the defendant and Gordon at various times spoke to him about getting money for his release.  Id. ¶ 26.  During those discussions, the amount demanded generally was $1 million.  Id.  The defendant also recorded a message from Lampert to his wife and then drove to New York with Jones.  Id.  While in New York, the defendant telephoned Lampert's residence from a public telephone, played the recorded message to Lampert's wife, and then briefly spoke.  Id.  The defendant and Jones then returned to the motel.  Id.

On January 11, 2003, the defendant and Gordon became aware that Harris had taken at least one of Lampert's credit cards when he left the motel.  Id. ¶ 27.  Consequently, the two drove to Harris's residence to retrieve it.  Id.  When the defendant and Gordon arrived at Harris's residence, the police were present at the house and were interviewing people.  Id.

The defendant and Gordon subsequently returned to the motel.  Id. ¶ 28. Once there, the defendant and Gordon disagreed about whether to release Lampert or to continue to hold him.  Id.  Gordon wanted to release him, while the defendant wanted to continue to hold him.  Id.  During this time, the defendant told Lampert that the defendant "was having a bad day" because the

13

police were now involved.  Id.  Lampert subsequently identified one abductor-- the defendant--as the "bad day guy" and a second individual--Gordon-as the "let him go guy."[4]  Id. During this period, the defendant and Gordon continued to negotiate with Lampert the amount of money Lampert could pay as ransom.  Id.

Either late in the evening on January 11 or in the early morning of January 12, the defendant accepted Lampert's offer to pay approximately $40,000 within five days to secure Lampert's release for his release.  Id. ¶ 29.  They further agreed that the money would be placed in a garbage can in a restroom at a Wendy's restaurant in Greenwich.  Id. The defendant, Gordon, and Jones subsequently drove Lampert to Greenwich and released him unharmed once there.  Id. The three then returned to the motel.  Id.

Sometime during January 12, the defendant, Gordon and Jones separated.  Id. ¶ 30. Gordon and Jones eventually met with Harris and the three returned to the motel.  Id. During the evening of January 12, Gordon, Harris, and Jones were arrested at the motel. Id. The police subsequently searched the motel room and recovered flexible plastic handcuffs, a mask, and the shotgun, among other things.  Id.

The defendant appears to have fled to Canada soon after releasing Lampert.  Id. ¶ 31. While fleeing, he telephoned at

---

[4]     At sentencing, the defendant falsely claimed that he was the "let him go guy."

14

least one individual in New Haven to request that the individual help him obtain the $40,000 which he believed would be left at the Wendy's.  Id.  The individual declined to do so.  Id.

On January 18, 2003, Rose was detained in Toronto, Canada for violating Canadian immigration laws.  Id. ¶ 33.  Canadian law enforcement officers also discovered his car with its license plates removed.  Id. Pursuant to a request from the United States Government, Canadian law enforcement officers obtained a search warrant for the car.  Id. The search of the car revealed flexible plastic handcuffs, at least one credit card receipt stolen from the East Haven Holiday Inn, rental car documents, a baseball hat bearing a Corona beer logo, an Alpine compact-disc changer, and an electronic voice distortion device, among other things.  Id.

**IV.   SENTENCING**

The PSR calculated the defendant's total effective Sentencing Guideline range to be 181 to 211 months imprisonment See Id. ¶ 102.

In calculating the defendant's Sentencing Guideline range, the PSR grouped Counts One and Two of the Superseding Indictment together and Counts Four and Five together.  Id. ¶ 43.  It calculated the defendant's adjusted offense level for Group One as follows:

Base offense level (U.S.S.G. § 2B3.2(a) ) . . . . . . . . . .   18
Express Threat of Death (U.S.S.G.§ 2B3.2(b)(1)) . . . . . . .  +2

15

```
Amount of Money Demanded-$1 Million (U.S.S.G. §§ 2B3.2(b)(2),
2B3.1(b)(7)(E). . . . . . . . . . . . . . . . . . . . . . .  +4
Abduction of Victim During Offense (U.S.S.G. § 2B3.2(b)(5)) . +4
Organizer, Leader, Manager of Offense (U.S.S.G. § 3B1.1(c)) . +2
Use of Minor (U.S.S.G. § 3B1.4) . . . . . . . . . . . . . . . +2
Adjusted Offense Level  . . . . . . . . . . . . . . . . . .  32
```

See PSR ¶¶ 45-53.

The PSR calculated the defendant's adjusted offense level for Group Two as follows:

```
Base offense level (U.S.S.G. § 2B3.1(a) ) . . . . . . . . .   20
Firearm Brandished (U.S.S.G.§ 2B3.1(b)(2)(C)) . . . . . . .   +5
Victim Physically Restrained During Offense (U.S.S.G. §
2B3.1(b)(4)(B). . . . . . . . . . . . . . . . . . . . .       +2
Offense Involved Carjacking (U.S.S.G. § 2B3.1(b)(5)) . . . . +2
Organizer, Leader, Manager of Offense (U.S.S.G. § 3B1.1(c)) . +2
Use of Minor (U.S.S.G. § 3B1.4) . . . . . . . . . . . . . .   +2
Adjusted Offense Level  . . . . . . . . . . . . . . . . . .  33
```

See PSR ¶¶ 54-62.

Pursuant to U.S.S.G. § 3D1.4, the PSR added two units to the highest adjusted offense level, in this case the adjusted offense level for Group Two, and concluded that the combined adjusted offense level was 35. See PSR ¶ 62. The PSR then reduced the combined adjusted offense level three points for acceptance of

16

responsibility and concluded that the total offense level was 32. See PSR ¶ 63.

The PSR also concluded that the defendant did not possess any criminal history points, corresponding to Criminal History Category I.  See PSR ¶ 66.

The PSR noted that the defendant's conviction for use and carrying of a  firearm in connection with Counts One and Two pursuant to 18 U.S.C. § 924(c) required imposition of a consecutive 5-year term of imprisonment.[5]

The Court ultimately sentenced the defendant to 181 months imprisonment.

## V. CONCLUSION

In short, given the nature of the defendant's criminal conduct, the level of planning and preparation that the defendant conducted by the defendant, the defendant's role in the offenses, the significant risk of injury to the victims of the offenses, and the lasting trauma to those victims, the Government respectfully suggests that the Court should not impose a non-

---

[5]     The PSR correctly noted that the defendant potentially was subject to a seven-year mandatory minimum  because he brandished a firearm during and in relation to the commission of a crime of violence.  In the plea agreement and during the plea allocution, however, the defendant was advised that he was facing a five-year mandatory minimum rather than a seven-year term.  The Government therefore requested that the district court impose the five-year mandatory minimum, which the district court did.

trivially different sentence on the defendant.

                              Respectfully submitted,

                              KEVIN J. O'CONNOR
                              UNITED STATES ATTORNEY

                              /s/
                   BY:  CHRISTOPHER W. SCHMEISSER
                        ASSISTANT UNITED STATES ATTORNEY
                        Federal Bar No. ct14806

                FOR:  JAMES J. FINNERTY
                        ASSISTANT UNITED STATES ATTORNEY
                        United States Attorney's Office
                        United States Courthouse
                        915 Lafayette Boulevard
                        Bridgeport, CT 06604
                        Tel: (203) 696-3000
                        Federal Bar No. ct15203

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 12th day of July, 2005, a true and correct copy of the foregoing motion was served by first-class mail, postage prepaid,  upon:

William T. Koch, Jr.
151 Brush Hill Road
Lyme, Connecticut 06371

Special Agent Donald Kleber
Special Agent Michael Syrax
Federal Bureau of Investigation
1000 Lafayette Boulevard
Bridgeport, Connecticut 06604

Carlo Jo Wagenstein-Vega
United States Probation Officer
United States Probation Office
915 Lafayette Boulevard
Bridgeport, Connecticut 06608
                              /s/
                   BY:  CHRISTOPHER W. SCHMEISSER
                        ASSISTANT UNITED STATES ATTORNEY


                FOR:  JAMES J. FINNERTY
                        ASSISTANT UNITED STATES ATTORNEY